1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JONATHAN MICHAEL RODRIGUEZ,              No.  2:13-cv-1013 GEB CKD P

12                   Petitioner,

13          v.                                FINDINGS AND RECOMMENDATIONS

14   RANDY GROUNDS,

15                   Respondent.

16

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  The petition, ECF 1, presents four claims challenging his 2009

19   convictions for kidnapping to commit specified sex offenses, sexual penetration with a foreign

20   object, commission of a lewd act on a child, first degree burglary, and misdemeanor resisting

21   arrest.  Respondent has answered.  ECF 21.  Petitioner has not filed a traverse.  Upon careful

22   consideration of the record and the applicable law, the undersigned will recommend that the

23   petition be denied.

24                            **BACKGROUND**

25          On November 17, 2009, petitioner was convicted by a jury in Nevada County Superior

26   Court on charges of kidnapping for the purpose of committing sexual penetration or lewd or

27   /////

28   /////

                                           1

1   lascivious act, in violation of Cal. Penal Code § 209(b)(1),[1] sexual penetration with a foreign

2   object by force, fear, or threats (§ 289(a)(1)), committing a lewd act upon a child of 14 or 15 who

3   was at least 10 years younger than defendant (§ 288(c)(1)), first degree burglary (§ 459), and

4   resisting arrest (§ 148(a)(1)).  2 CT 610-623[2], (California Court of Appeal Opinion, "Opinion" at

5   5.[3]).  The jury also found true the following weapon and sentence enhancement allegations:  that

6   petitioner used a knife in the commission of the offenses (§ 12022(b)(1)); that he committed the

7   offenses while out on bail on another charge (§ 12022.1); and, regarding the sexual penetration

8   conviction, that he committed the offense during the commission of a burglary and kidnapping

9   (667.61(d)(2) and (4), (e)(1) and (2)).  Id.  Petitioner admitted to a prior strike conviction (§

10  667(b) to (i)), and to serving a prior prison term (§ 667.5(b)).  Id., 1 CT 508.  Petitioner was

11  sentenced to an aggregate term of 59 years to life in prison.  Opinion at 5.

12       On direct appeal petitioner argued that (1) his admissions should have been excluded at

13  trial because his Miranda[4] rights were violated; (2) the trial court abused its discretion in

14  admitting evidence of five of his prior convictions for impeachment purposes; (3) he cannot be

15  punished for both sexual penetration with a foreign object and lewd conduct because the jury's

16  verdict might have been based on the same act; (4) it was a violation of Penal Code section 654 to

17  punish him for both kidnapping to commit specified sex offenses, and the underlying sex

18  offenses; and (5) the trial court abused its discretion in denying his request to dismiss the prior

19  strike conviction.  Id. at 2.

20       In an unpublished memorandum and opinion, the California Court of Appeal, Third

21  Appellate District, stayed the sentence on petitioner's kidnapping conviction, but affirmed the

22  judgment of conviction in all other respects.[5]  The court provided the following factual and

23

24

---

[1]  Further references are to the California Penal Code unless otherwise specified.
[2]  ("CT") Clerk's Transcript on Appeal.  Lodged as Volumes 1 and 2.
[3]  Page number citations such as this one are to the page numbers reflected on the court's CM/ECF system.
[4]  Miranda v. Arizona, 384 U.S. 436 (1966).
[5]  The court remanded to the trial court to correct three clerical errors in the abstract of judgment. Opinion at 15.

procedural summary of the case:[6]

> On the morning of June 18, 2008, Robert Griffiths and his wife went to work, leaving their five children at home. The children were ages 2, 5, 8, 10, and 12. Their babysitter, Jane Doe, was going to arrive later that morning. After the Griffiths left but before Jane Doe arrived, defendant came to the side door and asked Kyle, who was eight, if his parents were home. When Kyle indicated they were not, defendant said, "I need to go to the bathroom and get a drink." Defendant entered the Griffiths's home holding an open pocket knife in his hand.

> Jane Doe arrived shortly after defendant entered the home. Kyle informed her that there was a strange man in the house, but when she checked the home she did not find anyone. Around 15 minutes later, Jane Doe went into the girls' bedroom to change the diaper of the youngest Griffiths child. Defendant was standing behind the door holding a knife in his hand. Jane Doe was "taken aback" and asked what he wanted. Defendant "herded [her] into the room" and then shut the door and locked it. Defendant was dressed "haphazardly" in a black beanie with blue sequins, a partially buttoned long-sleeved shirt, and gray shorts. Jane Doe asked again what he wanted, and defendant replied he did not know. Defendant played with the knife intermittently, in a manner that made Jane Doe think he was reminding her that he was in power.

> When defendant saw Kyle looking in through the bedroom window, defendant led Jane Doe down the hall to the master bedroom and locked the door. She felt like she was losing control of the situation, and her primary concern was for the toddler, whom she was carrying. Jane Doe tried to make conversation and told defendant that it was her 14th birthday that day. She urged defendant to leave and not to make "bad choices," but he was not "buying it." She noticed that defendant had a "swirly" tattoo on his stomach. The Griffiths boys began throwing rocks at the master bedroom window, and then used their slingshot on the bedroom door.

> Defendant moved Jane Doe into the master bathroom, still carrying the toddler. He became more "touchy feely," touching her back and the top of her bottom. Jane Doe told him to stop but he ignored her. Defendant told her to turn and face the wall, but she refused. Defendant started getting angrier and, while holding his knife, told her to take off her clothes or he would cut them off. The knife blade was very close to Jane Doe's face. They went back into the master bedroom and she asked defendant if he was going to rape her. He replied no, he "just want[ed] to see her."

> Defendant lifted up Jane Doe's shirt and cut her sports bra in half before removing her tee shirt and undershirt. He sat behind her, grabbed her breasts, and rubbed her belly for one or two minutes.

---

[6] These facts as recited by the state court are presumed true for purposes of this court's review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and the petitioner does not contend otherwise. See 28 U.S.C. § 2254(e)(1).

3

Jane Doe felt violated, sickened and repulsed during the assault. Defendant then stood up and told Jane Doe to stand up. Defendant removed her shorts and underwear. He stood behind her, put most of his finger "under the two flaps of skin" of her vagina and felt around.

Defendant told Jane Doe to lie down on the bed, and when she refused he dragged the dull side of the knife blade across her throat. He started to get "really mad," so she complied and lay face down. Defendant forced her legs apart, pulled back the skin and looked at her vagina. He attempted to penetrate her with his finger but, although his finger got past the flaps of skin, it did not go in her vagina.

Deputy Sheriff Mark Hollitz and other law enforcement officers were dispatched to the Griffiths's residence after receiving a call that there was a strange man in the house. Deputy Hollitz arrived right after defendant sexually penetrated Jane Doe. Jane Doe heard someone knock on the bedroom door and announce "police." Deputy Hollitz asked if everything was alright; Jane Doe replied "No" and unlocked the bedroom door. When Deputy Hollitz entered the room, Jane Doe was naked and holding a toddler. She pointed to the bathroom window. Deputy Hollitz turned and saw someone leaving through the window.

Defendant ran from the residence, drove off in a red Nissan Sentra and crashed through a parking lot gate with police in pursuit. He was apprehended a short time later while hiding inside the home of Daniel Williams.

Defendant was interviewed. Both the recording and the written transcript of the interview were admitted at trial. Defendant admitted entering the Griffiths's residence, but claimed an 8 or 10–year–old boy gave him permission to do so. He denied committing any sex offenses on Jane Doe, but admitted he had a knife, Jane Doe told him "you're kind [of] scaring me," and he got the impression she wanted him to leave. Defendant was ashamed of "how it went down," but denied any penetration occurred and claimed that even if there was any sexual contact, it would have been no more than statutory rape.

The doctor who examined Jane Doe observed bruising on her hymen and small cuts on the edges, consistent with sexual penetration past the labia majora and labia minora.

Defendant testified at trial. He claimed he was with his friend, Travis Kneebone, on the day in question and that Kneebone stopped at the Griffiths's residence. The two went into the house and defendant used the bathroom. As defendant walked down the hallway, he came upon Jane Doe, who was with a toddler. After a brief conversation, they went into the girls' bedroom and Jane Doe asked him to close and lock the door. She changed the toddler's diaper while defendant fiddled with his folding knife as a "nervous habit."

4

After changing the toddler's diaper, Jane Doe suggested going to see what Kneebone was doing. Defendant put his hand on her shoulder, making an "after you" gesture, and they walked to the master bedroom where they found Kneebone. Kneebone locked the door and defendant offered Jane Doe some marijuana, but she declined. Defendant took out his knife again and accidentally cut his finger. He went into the master bathroom to wash the cut.

Defendant came out of the bathroom when he heard a loud noise like a rock on the window. Kneebone and Jane Doe were sitting on the bed, and Kneebone gestured for defendant to leave. Defendant went into the bathroom and sat on the toilet seat. After a time, the door opened and Kneebone came in with Jane Doe, who was still holding the toddler. The other children came to the door and Jane Doe told them to go away. After they left, Kneebone and Jane Doe went back into the bedroom, and within five minutes defendant heard sirens. Defendant went into the bedroom and saw Kneebone on the bed with Jane Doe, who was naked from the waist up. Defendant denied he sexually touched the victim. He also denied using the knife to threaten her, or to cut off her clothing.

Defendant testified that when the police knocked on the door, Jane Doe instructed him to leave via the window and told Kneebone to get into a trunk at the foot of the bed. Defendant jumped out of the window and ran to his car. He drove away from the officer in the parking lot because he was being tailgated. He left his car at a park and eventually went to Daniel Williams's house, where he was arrested.

A detective who participated in the initial walkthrough of the crime scene said he did not notice the trunk at the foot of the bed because it was covered with a sheet. However, he searched the trunk later in the afternoon and it was filled with neatly folded bedding and clothing. It would have been very difficult for Kneebone to either fit or be concealed in the trunk.

Travis Kneebone testified that defendant came by his house that day but Kneebone did not go with him to the victim's house. Kneebone did not have any tattoos on his stomach. Neither Kyle nor Jane Doe saw another man inside the house that day. None of the fingerprints lifted from the Griffiths's house and the Nissan Sentra matched Kneebone, but four fingerprints from the house and five from the car matched defendant.

A jury convicted defendant of kidnapping to commit specified sex offenses (Pen.Code, § 209, subd. (b)(1)), sexual penetration with a foreign object (§ 289, subd. (a)(1)), commission of a lewd act on a child at least 10 years younger than defendant (§ 288, subd. (c)(1)), first degree burglary (§ 459), and misdemeanor resisting arrest (§ 148, subd. (a)(1)). The jury found that defendant used a knife in the commission of the offenses (§ 12022, subd. (b)(1)) and that he committed the offenses while out on bail on another felony charge (§ 12022.1). Regarding the sexual penetration conviction, the jury found the offense was committed during the commission of a burglary and kidnapping. (§ 667.61, subds.(d)(2) & (4), (e)(1) &

5

> (2).) Defendant admitted a prior strike conviction within the meaning of section 667, subdivisions (b)-(i) and that he had served a prior prison term (§ 667.5, subd. (b)).

Opinion at 2-5. (footnotes omitted).

Following the California Court of Appeal's affirmance of his conviction, a petition for review was filed on petitioner's behalf with the California Supreme Court. LD 4.[7] The petition for review raised the same issues that were presented on direct appeal, and was summarily denied by the California Supreme Court. LD 5. Petitioner did not attack his judgment of conviction by filing a habeas petition in state court. Petitioner filed the instant petition for federal habeas relief on May 22, 2013. ECF 1.

Petitioner seeks federal habeas relief on the following grounds: (1) the waiver of his Miranda rights was involuntary; (2) the trial court erred by admitting evidence of his five prior convictions for impeachment purposes; (3) his rights under the Double Jeopardy Clause of the Fifth Amendment were violated by the imposition of separate prison sentences for committing a lewd and lascivious act upon a child and sexual penetration with a foreign object; and (4) the trial court's denial of his Romero motion to strike his prior conviction violated the Eighth Amendment's prohibition against cruel and unusual punishment. ECF 1 at 5-10. The instant habeas petition incorporates the same arguments raised in the petition for review that was filed before the California Supreme Court. ECF 16-101.

**STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA**

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the

---

[7] ("LD") Notice of Lodged Documents, 1-6.

1    State court proceeding.

2    The statute applies whenever the state court has denied a federal claim on its merits,

3    whether or not the state court explained its reasons.  Harrington v. Richter, 131 S. Ct. 770, 785

4    (2011).  State court rejection of a federal claim will be presumed to have been on the merits

5    absent any indication or state-law procedural principles to the contrary.  Id. at 784-785 (citing

6    Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is

7    unclear whether a decision appearing to rest on federal grounds was decided on another basis)).

8    "The presumption may be overcome when there is reason to think some other explanation for the

9    state court's decision is more likely."  Id. at 785.

10    The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

11    principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

12    U.S. 63, 71-72 (2003).  Clearly established federal law also includes "the legal principles and

13    standards flowing from precedent."  Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002)

14    (quoting Taylor v. Withrow, 288 F.3d 846, 852 (6th Cir. 2002)).  Only Supreme Court precedent

15    may constitute "clearly established Federal law," but circuit law has persuasive value regarding

16    what law is "clearly established" and what constitutes "unreasonable application" of that law.

17    Duchaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000); Robinson v. Ignacio, 360 F.3d 1044,

18    1057 (9th Cir. 2004).

19    A state court decision is "contrary to" clearly established federal law if the decision

20    "contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529

21    U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state

22    court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to

23    the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court

24    was incorrect in the view of the federal habeas court; the state court decision must be objectively

25    unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

26    Review under § 2254(d) is limited to the record that was before the state court.  Cullen v.

27    Pinholster, 131 S. Ct. 1388, 1398 (2011).  The question at this stage is whether the state court

28    reasonably applied clearly established federal law to the facts before it.  Id.  In other words, the

7

1   focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 1399.  Where the

2   state court's adjudication is set forth in a reasoned opinion, §2254(d)(1) review is confined to "the

3   state court's actual reasoning" and "actual analysis."  Frantz v. Hazey, 533 F.3d 724, 738 (9th

4   Cir. 2008) (en banc).  A different rule applies where the state court rejects claims summarily,

5   without a reasoned opinion.  In Richter, supra, the Supreme Court held that when a state court

6   denies a claim on the merits but without a reasoned opinion, the federal habeas court must

7   determine what arguments or theories may have supported the state court's decision, and subject

8   those arguments or theories to § 2254(d) scrutiny.  Richter, 131 S. Ct. at 786.

9                                   **DISCUSSION**

10  I.  Claim One:  Miranda Waiver

11          Petitioner first claims that the waiver of his Miranda rights, which he contends was made

12  after he had been held for hours in a "dry cell" without food or water, was involuntary due to the

13  conditions of confinement, and because the receipt of food and water was conditioned on his

14  providing a statement to law enforcement.  ECF 26.  Petitioner further contends that he invoked

15  his right to counsel and his right to remain silent toward the end of the interrogation.  Id.

16          A.  Background

17          Petitioner first raised this claim in a pretrial motion to suppress.  1 CT 184-192 (under

18  seal).  A hearing was held on the motion, 6 RT 41-191[8], and the relevant facts were summarized

19  by the state court of appeal as follows:

20              At the suppression hearing, the prosecution presented evidence that
            Deputy Sheriff Jeff Martin arrested defendant around 1:30 p.m. and
21          transferred him to the county jail where he was placed in a "dry
            cell." Deputy Martin instructed the jail to withhold food to facilitate
22          an evidentiary medical examination later that day, but did not
            instruct them to withhold water. Detectives were working on
23          obtaining a search warrant for the evidentiary medical examination,
            and it is standard operating procedure to withhold food pending the
24          examination.

25              Defendant requested water but none was provided. He began pacing
            and banged his head and hands on the cell window. Around 3:00
26          p.m., a criminal investigator photographed defendant with and
            without clothing. Around 8:30 p.m., Sergeant Guy Selleck
27

28  [8] ("RT") Reporter's Transcript on Appeal.  Lodged as Volumes 1 through 6.

                                          8

transported defendant to the hospital for the evidentiary medical examination. Upon defendant's request, he was given four or five cups of water at the hospital. On the ride back to the jail, defendant stated he was hungry. Sergeant Selleck suggested to Detective Robert Jakobs that defendant would be more cooperative if he was given food.

Detective Jakobs met with defendant around midnight. Defendant was given some pizza and a cup of water. Defendant already had a partial can of soda. Detective Jakobs waited until defendant had finished eating and then read him his Miranda rights. Defendant indicated that he understood by nodding his head. Detective Jakobs asked if defendant was willing to talk to him, stating, "If you want to talk I'll ah, I'll let you start." Defendant replied he had always heard he should not make statements, but "first off" he wanted to know the charges against him. Detective Jakobs advised defendant of the charges. Defendant then told Detective Jakobs his version of events and answered questions.

About halfway through the interview defendant said, "I don't know, maybe I should just wait and talk to my attorney cause, I mean ... I'm sure ... people say things when they're being questioned by a police officer that they normally wouldn't necessarily say." Without pausing, however, defendant continued talking to Detective Jakobs and related that it was a madhouse when the officers found him at Williams's house.

Defendant continued answering questions until Detective Jakobs asked him if there was anything else he wanted to add to the conversation. Defendant queried if Detective Jakobs meant "based on what [Jane Doe] said, based on the evidence," and Detective Jakobs replied in the affirmative. Defendant asked if they were going forward with the charges against him. When Detective Jakobs replied, "Absolutely, absolutely," defendant stated, "Nah, I don't got nothing else to say." Detective Jakobs said, "I mean," at which point defendant spontaneously volunteered that the charges were false. Defendant said he told Jane Doe he did not want to have sex with her because she was a virgin. He said he did not assault her and there was no burglary because he was invited into the residence.

Defendant testified at the suppression hearing. He stated that it made him uncomfortable when he was photographed in the nude. He also claimed he requested water about 20 times but was only given water once while he was in the dry cell. No one gave him food, but defendant admitted he did not ask for any. He saw a tray of food on the counter outside his cell and assumed it was for him but he did not receive it.

Defendant testified that during his transportation back to his cell following the evidentiary medical examination, he told Sergeant Selleck that he was hungry, but they did not stop for food. When they arrived back at the jail, defendant "felt that this would be the opportune time to get [food]" because they would not be serving breakfast for several hours, "[s]o if [he] was going to get anything,

1

2

3

4

this would have been the time." He let the people in charge know that he would like some food and water. He said that if he had not received food or water, he would not have spoken with them. Defendant admitted, however, that Detective Jakobs never said defendant had to talk to him to receive food and water, and no one threatened defendant or told him that anything bad would happen if he did not talk. In fact, Detective Jakobs was courteous to him.

5

6

7

8

9

10

The trial court found that defendant's waiver of rights and his subsequent statements were voluntary. It found that defendant received food and water prior to his waiver and interrogation, and the promise of food and water had not been used to coerce him into talking. The trial court concluded that the mere recognition that someone might be more cooperative after being fed did not make the situation coercive unless food and water were used as leverage, which they were not. The trial court found that defendant's subsequent references to perhaps needing an attorney and not talking further were not consequential because defendant continued talking of his own accord.

11

Opinion at 6-7.  This summary is consistent with this court's review of the record.

12

      B.  California Court of Appeal Opinion

13

After independently reviewing the totality of the circumstances to determine whether the

14

prosecution had met its burden to prove the statements were voluntary, the appellate court found

15

that the circumstances supported the trial court's conclusion that petitioner voluntarily waived his

16

Miranda rights.  Specifically, the court observed that when Detective Jakobs asked petitioner if he

17

understood his Miranda rights, petitioner nodded affirmatively.  Opinion at 8.  Subsequently,

18

when Jakobs invited petitioner to start talking, he began speaking to Jakobs and answering his

19

questions.  Id.  Under the circumstances, the California Court of Appeal concluded that an

20

express waiver was not required because petitioner's actions made it clear that a waiver was

21

intended.  Id.  Moreover, the court found nothing in the record to support petitioner's claim that

22

his waiver was coerced by the desire to obtain food and water, nor did it find any evidence to

23

suggest that petitioner's will was overborne at the time he confessed.  Id. at 8-9.  The appellate

24

court concluded that his statement, "I don't know, maybe I should just wait and talk to my

25

attorney," made during the course of the interrogation, did not qualify as an unambiguous request

26

for counsel.  Id. at 9.  Petitioner continued to speak with Jakobs without pause immediately after

27

making the statement, and the court determined that such an equivocal and ambiguous reference

28

to an attorney did not require law enforcement to cease their questioning.  Id.  Finally, the court

10

1  determined that petitioner failed to invoke his right to remain silent when he voluntarily

2  continued to speak after stating that he had nothing else to say.  Id.  In light of the foregoing, the

3  California Court of Appeal found substantial evidence to support the trial court's denial of

4  petitioner's motion to exclude statements in violation of Miranda.  Id.

5        C.  Analysis

6        To prevail on a Miranda claim, a petitioner seeking federal habeas relief must demonstrate

7  that his statements were obtained in violation of the rules of custodial interrogation established by

8  the United States Supreme Court in Miranda, 384 U.S. at 436.  In Miranda, the Supreme Court

9  held that a suspect subject to custodial interrogation has a right to consult with an attorney and

10  have counsel present during questioning and that police must explain this right to the suspect

11  before questioning begins.  Id. at 469-73.  The advisements required by Miranda arise from the

12  Fifth Amendment right against self-incrimination, which guarantees that any person taken into

13  custody shall be informed of his important constitutional rights and shall be given the opportunity

14  knowingly and voluntarily to waive those rights before being interrogated.  Id. at 444.

15        The undersigned has reviewed the transcript of petitioner's interrogation and hearing on

16  the motion to exclude his statements, and agrees with the conclusions reached by the California

17  Court of Appeal.  Petitioner was given food and drink prior to being advised of his Miranda

18  rights, and although there was no express waiver, the record supports the state court's finding that

19  there was an implied waiver that was constitutionally effective.  Sealed Interrogation Transcript

20  ("Transcript") at 2-6.  Petitioner acknowledged that he understood his rights, and proceeded to

21  speak with Detective Jakobs thereafter.  Id.  Petitioner's acknowledgment of having been advised

22  of his Miranda rights and willingness to continue to answer questions militates against a finding

23  that his statements were involuntary or coerced.

24        Further, whether an accused has invoked the right to counsel during questioning is an

25  objective inquiry.  The United States Supreme Court has held that the inquiry requires the trial

26  court to consider whether the accused's statement "'can reasonably be construed to be an

27  expression of a desire for the assistance of an attorney.'"  Davis v. United States, 512 U.S. 452,

28  459 (1994) (quoting McNeil v. Wisconsin, 501 U.S. 171, 178 (1991)).  If the desire for counsel is

1   presented "sufficiently clearly that a reasonable police officer in the circumstances would

2   understand the statement to be a request for an attorney," no ambiguity or equivocation exists,

3   and all questioning must cease until the person can consult counsel or the accused voluntarily

4   reinitiates conversation.  Davis, 512 U.S. at 459.  Moreover, under Miranda, "if [an] individual

5   indicates in any manner, at any time prior to or during questioning, that he wishes to remain

6   silent, the interrogation must cease."  Miranda, 384 U.S. at 473-74

7          The parties agree that, during the interrogation, petitioner said, "maybe I should just wait

8   and talk to my attorney."  LD 1 at 18, LD 2 at 8.[9]  Detective Jakobs did not respond to the

9   comment.[10]  Id.  Petitioner then stated, "[n]ah, I don't got nothing else to say."  Transcript at 47.

10  Contrary to petitioner's assertion, he then continued to make incriminating statements without

11  further prompting or questioning from Detective Jakobs.  Id. at 47-48.  He insisted the charges

12  were false, but admitted to having a conversation with the victim about why he wouldn't have sex

13  with her.  Id.  Detective Jakobs asked petitioner whether he thought the victim was attractive.  Id.

14  at 48.  Petitioner responded that it didn't matter then, without hesitation, began to discuss how

15  there was no assault and no weapon, and that he was invited into the home by one of the children.

16  Id.  Under these circumstances, the state court's conclusion that petitioner's request for counsel

17  was ambiguous and that he failed to invoke his right to remain silent, was entirely reasonable.

18         Accordingly, the state court's determination that there was no violation of petitioner's

19  Miranda rights was not contrary to, or an unreasonable application of, clearly established

20  Supreme Court precedent.

21  II.  Claim Two:  Prior Convictions

22         Petitioner next contends that the trial court erred by admitting evidence of five of his prior

23  convictions for impeachment purposes, because the admitted prior convictions were "relatively

24  remote," and the admission of all five into evidence amounted to "overkill" that prejudiced his

25  defense.  ECF 1 at 37-39.

26

27  [9] ("LD 1") Appellant's Opening  Brief, ("LD 2") Respondent's Brief

28  [10] Petitioner's comment is audible on the DVD of the interrogation, but does not appear on the
    transcript.  Petitioner does not dispute that the statement was made exactly as worded.

1     A. <u>Background</u>

2         The prosecution filed a pretrial motion in limine seeking to impeach petitioner regarding

3     the existence of five prior convictions[11] if he chose to testify at trial.  1 CT 290-91.  At the limine

4     hearing, defense counsel acknowledged that if petitioner chose to testify at trial, he would first

5     elicit whether his client had suffered any prior felony convictions.  1 RT 466-67.  However,

6     defense counsel objected to the prosecution getting into the specifics of the prior convictions and

7     asked the court to exercise its discretion to exclude the evidence altogether under Cal. Evid. Code

8     § 352 because of the danger of undue prejudice.  <u>Id.</u> at 467.  The court considered the arguments

9     of the parties, and held that the prosecution could use all five prior convictions for impeachment

10    purposes, but limited it solely to the offense and date of conviction and a statutory description of

11    the offense, without getting into the underlying facts.  <u>Id.</u> at 472-73.  At trial, petitioner testified

12    on his own behalf and admitted to all five prior felony convictions, and the date on which they

13    occurred.  4 RT 1004-05.  The prosecution did not seek to elicit any further testimony concerning

14    the convictions.  4 RT 1049-1097.  Accordingly, the trial court admitted the prior convictions and

15    admonished the jury that, pursuant to the pre-trial instruction that had been given under

16    CALCRIM 105, the convictions were to be used for the limited purpose of judging the

17    petitioner's credibility, and not for any other purpose.  4 RT 1111-12, 1 CT 537.

18        B. <u>California Court of Appeal Opinion</u>

19        On direct appeal, petitioner argued that the convictions, which occurred about nine years

20    before the instant offense, were too remote in time, and that allowing all five convictions into

21    evidence was needlessly prejudicial because it amounted to "overkill in the impeachment

22    process."  LD 1 at 39-42.

23        The California Court of Appeal determined that, even if the prior convictions could be

24    considered remote, it did not make them inadmissible under state law because petitioner had

25    received additional felonies in 2006.  Opinion at 10.  The court also rejected petitioner's second

26

27    _____

[11]  The convictions, all sentenced on March 17, 2000, were for the following offenses:
      threatening a witness; battery on a school employee; auto theft; forgery; and grand theft.  4 RT

28    1005.

13

1    argument, finding that California courts have not placed arbitrary limits on the number of prior

2    convictions that are admissible for impeachment, and concluded that "[petitioner's] extensive

3    record disqualifies him from testifying with the aura of veracity that might attend a lone felony

4    conviction."  Id.  In any event, considering the weight of the evidence against petitioner, the court

5    found no prejudice because it was not reasonably probable the jury would have returned a more

6    favorable verdict if the court had limited the number of convictions the prosecution could use for

7    impeachment.

8        C.  Analysis

9        Failure to comply with the state's rules of evidence is not a sufficient basis for granting

10   federal habeas relief.  Jammal v. Van de Kamp, 926 F. 2d 918, 919 (9th Cir. 1991).  Insofar as

11   petitioner's claim is based on alleged violations of state law or the California Constitution, it is

12   not cognizable on federal habeas review.  Estelle v. McGuire, 502 U.S. 62, 67 (1991) ("[i]t is not

13   the province of a federal habeas court to reexamine state-court determinations on state-law

14   questions. …[i]n conducting habeas review, a federal court is limited to deciding whether a

15   conviction violated the Constitution, laws, or treaties of the United States."). The California Court

16   of Appeal relied on state law to reject petitioner's argument that the convictions were too remote

17   in time.  People v. Mendoza, 78 Cal.App.4th 918, 925-26 (2000) ("Even a fairly remote prior

18   conviction is admissible if the defendant has not led a legally blameless life since the time of the

19   remote prior").  Likewise, the court relied on state authority to reject petitioner's argument that

20   the prejudicial effect of admitting all five priors outweighed its probative value.  People v. Duran,

21   140 Cal.App.3d 485, 500 (1983) ("A series of crimes relevant to character for truthfulness is

22   more probative of credibility than a single lapse, and the trial court must weigh against that value

23   the danger of prejudice").  The California Court of Appeal found no error under state law, and a

24   federal habeas court is bound by the state courts' interpretation and application of state law.

25   Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

26       Construing the pro se petition liberally to find that a federal due process claim has been

27   raised, petitioner's argument nevertheless fails.  In order to prevail, petitioner must show that

28   "admission of the evidence so fatally infected the proceedings as to render them fundamentally

14

1   unfair."  <u>Van de Kamp</u>, 926 F. 2d at 919.  Petitioner opened the door to impeachment by

2   testifying in his defense.  4 RT 1004.  Defense counsel sought to allay any prejudice by eliciting

3   testimony regarding the prior convictions from petitioner on direct exam.  <u>Id.</u> at 1004-06.

4   Petitioner fails to show how the admission of all five prior convictions, as opposed to some lesser

5   number, rendered his trial fundamentally unfair as to amount to the deprivation of a federal right.

6           Accordingly, this claim should be dismissed.

7   III. <u>Claim Three:  Double Jeopardy</u>

8           Petitioner contends that his sentence for committing a lewd and lascivious act in count

9   three must be stayed because the act required proof of the same conduct that supported his

10   conviction in count two, sexual penetration with a foreign object.  ECF 1 at 39.  Petitioner

11   contends that both Cal. Penal Code § 654 and the Double Jeopardy clause of the Fifth

12   Amendment prohibit such multiple punishments for the same act.  ECF 1 at 40.

13           A. <u>Court of Appeal Opinion</u>

14           The California Court of Appeal rejected this argument because there was evidence of

15   three sexual acts to support the two convictions.  Opinion at 11.  There was one act of lewd

16   conduct when petitioner groped the victim's breasts and two separate and distinct acts of foreign

17   object penetration by petitioner's finger.  <u>Id.</u>  The information did not specify that the lewd

18   conduct involved foreign object penetration, and the prosecutor specifically referred to

19   petitioner's fondling the victim's breasts and belly to support the lewd conduct charge.  <u>Id.</u>  As

20   such, the court found nothing in the record that was sufficient to establish a violation of the

21   multiple punishment prohibition of § 654, because the two convictions were not necessarily based

22   on the same act of sexual penetration.  <u>Id.</u>

23           B. <u>Analysis</u>

24               1. <u>State Law Claim</u>

25           California Penal Code 654(a) provides: "An act or omission that is punishable in different

26   ways by different provisions of law shall be punished under the provision that provides for the

27   longest potential term of imprisonment, but in no case shall the act or omission be punished under

28   more than one provision.  An acquittal or conviction and sentence under any one bars a

1    prosecution for the same act or omission under any other."

2    Again, as discussed *supra*, in section II, insofar as petitioner's claim is based on an

3    alleged violation of California state law, it is not cognizable on federal habeas review.  Estelle,

4    502 U.S. at 67.  Because the California Court of Appeal found no violation of the multiple

5    punishment prohibition of § 654, this federal habeas court is bound by the state courts'

6    interpretation and application of its own law.  Bradshaw, 546 U.S. at 76.

7                            2.  Fifth Amendment

8    Petitioner's attempt to obtain relief by claiming a violation of his rights under the Double

9    Jeopardy Clause of the Fifth Amendment likewise fails. On direct appeal, the California Court of

10   Appeal resolved the multiple punishment issue purely on state law grounds, and did not directly

11   address petitioner's Fifth Amendment Double Jeopardy claim.  Opinion at 10-11.  Petitioner

12   raised the Fifth Amendment issue in his petition for review before the California Supreme Court,

13   but the court summarily denied review.  LD 4, 5.  Where the state court reaches a decision on the

14   merits but provides no reasoning to support its conclusion, a federal habeas court independently

15   reviews the record to determine whether habeas corpus relief is available under 2254(d).  Himes

16   v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de

17   novo review of the constitutional issue, but rather, the only method by which we can determine

18   whether a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853. Where

19   no reasoned decision is available, the habeas petitioner still has the burden of "showing there was

20   no reasonable basis for the state court to deny relief."  Richter, 131 S. Ct. at 784.

21   The Double Jeopardy Clause of the Fifth Amendment prohibits the imposition of multiple

22   punishments for the same offense.  Ball v. United States, 470 U.S. 856, 864-65 (1985).  Sections

23   288 and 289 of the California Penal Code state, in pertinent part:

24              § 288. Lewd or lascivious acts; penalties; psychological harm to
                victim

25
                (a) Any person who willfully and lewdly commits any lewd or
26              lascivious act ... upon or with the body, or any part or member
                thereof, of a child who is under the age of 14 years, with the intent
27              of arousing, appealing to, or gratifying the lust, passions, or sexual
                desires of that person or the child, is guilty of a felony ...
28

16

1

(c) (1) Any person who commits an act described in subdivision (a) with the intent described in that subdivision, and the victim is a child of 14 or 15 years, and that person is at least 10 years older than the child, is guilty of a public offense ...

2

3

§ 289. Forcible acts of sexual penetration; punishment

4

(a)(1)(A)  Any person who commits an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim ...shall be punished by imprisonment ...

5

6

7        The undersigned has reviewed the victim's testimony in conjunction with the prosecutor's

8   closing argument, and finds substantial evidence to support the state court's conclusion that

9   petitioner committed at least three (if not more) separate sexual acts.  3 RT 823-49, 5 RT 1245-

10  60.   The victim described, in some detail, being herded into the bathroom by petitioner as he

11  rubbed her back, shoulders, and buttocks; then he cut her clothes off and felt her naked breasts

12  and stomach, before penetrating her vagina with his fingers.  Id.  Stopping briefly to move to the

13  bedroom, petitioner had the victim lie down on the bed, then forced her legs apart, and attempted

14  to penetrate her vagina with his fingers a second time.  Id.  Petitioner's reliance on People v. Siko,

15  45 Cal.3d 820, 826 (1988), where the California Supreme Court stayed a lewd conduct sentence

16  upon finding facts indicating that the defendant was being punished twice for the same act, is

17  misplaced.  Here there is nothing to indicate that petitioner was punished twice for one act, as the

18  jury could have based the lewd act conviction on any number of details that were provided by the

19  victim that would satisfy the requirements of § 288.  Moreover, there was ample evidence of at

20  least two separate acts of digital penetration that were distinct from the lewd conduct, which is

21  sufficient to support the foreign object penetration charge under § 289.  It was entirely proper for

22  the trial court to impose separate punishments for lewd conduct and penetration with a foreign

23  object, as petitioner's two convictions were not necessarily based on the same sexual act.

24        The state court's decision on this matter was not objectively unreasonable in light of

25  federal law on double jeopardy.

26  IV. Claim Four:  Eighth Amendment

27        Petitioner's final contention is that the trial court's denial of his Romero motion to dismiss

28  a prior strike conviction (attempted residential burglary) resulted in a sentence that violates the

17

1    Eighth Amendment's prohibition against cruel and unusual punishment.  ECF 1 at 44-45.

2    Specifically, petitioner argues that the trial court (1) failed to give sufficient weight to his mental

3    illness as a mitigating factor; (2) failed to sufficiently consider whether the prior strike qualified

4    as a serious or a violent felony; and (3) erroneously treated his use of a knife as a

5    "preaggravating" circumstance.  Id. at 45-49.

6        Respondent argues that petitioner's Eighth Amendment claim is procedurally defaulted

7    because he failed to present the claim to the state court of appeal in a timely fashion.  ECF 21-1 at

8    32.  Because the issue fails on the merits, the undersigned will not require petitioner to establish

9    cause and prejudice for the procedural default.  Flournoy v. Small, 681 F.3d 1000, 1004 n. 1 (9th

10    Cir. 2012) (a court may exercise discretion not to resolve an issue of procedural bar when the

11    petition clearly fails on its merits.)  However, because neither the California Court of Appeal or

12    the California Supreme Court reached the merits of petitioner's Eighth Amendment claim, this

13    court must conduct an independent review of the record to determine whether the state court

14    decision is objectively unreasonable.  Himes, 336 F.3d at 853.

15        A.  Background

16        Prior to the imposition of sentence, the trial court heard arguments from counsel and a

17    statement from petitioner regarding his Romero motion seeking to dismiss the prior strike

18    conviction.  5 RT 1421-47.  The California Court of Appeal summarized the proceedings as

19    follows:[12]

20
21
22
23
24
25
26

> In reaching its decision in this case, the trial court employed the factors required under Williams by considering the nature and circumstances of the present felony conviction and the prior strike, along with defendant's background, character, and prospects.  The trial court noted defendant's cruelty to the victim, his use of a knife, and the fact the crime was committed in the presence of small children. The trial court observed that defendant's criminal conduct had been escalating in terms of seriousness. It considered defendant's mental illness, but stated the illness was more evident in his prior crimes than in the current ones. The trial court indicated defendant's prospects on the outside were bleak, despite having a supportive family. It concluded defendant was "exactly the kind of

27    [12]  These facts as recited by the state court are presumed true for purposes of this court's review

28    under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and the petitioner does not contend otherwise.  See 28 U.S.C. § 2254(e)(1).

1    person [that the voters] were thinking about" when they adopted the
2    three strikes law.

3    ECF 21-1 at 13-14.

4          The court went on to note that, under California law, the trial court's ruling on a motion to

5    dismiss a prior conviction is reviewed for an abuse of discretion, and that the defendant had the

6    burden of establishing that the trial court's denial of the motion was arbitrary or irrational.  Id. at

7    13.  Applying this standard, the appellate court determined that the trial court's decision was

8    supported by the record, and found no abuse of discretion because petitioner failed to meet his

9    burden to show that the decision was arbitrary or irrational.  Id. at 14.

10         B.  Analysis

11             1.  State Law Claim

12         Again, as discussed *supra*, in sections II and III, insofar as petitioner's claim is based on

13   an alleged violation of California state law, it is not cognizable on federal habeas review.  Estelle,

14   502 U.S. at 67.  Because the California Court of Appeal found that the trial court did not abuse its

15   discretion by denying petitioner's Romero motion, this federal habeas court is bound by the state

16   courts' interpretation and application of its own law.  Bradshaw 546 U.S. at 76.

17             2.  Eighth Amendment

18         Petitioner claims that his enhanced 50 years to life sentence, due to the application of

19   California's Three Strikes Law, violates the Eighth Amendment.  ECF 1 at 44-45.  In evaluating

20   an Eighth Amendment claim challenging a sentence for a term of years, "[a] gross

21   disproportionality principle" applies.  Lockyer v. Andrade, 538 U.S. 63, 72 (2003).  The "precise

22   contours" of the principle are "unclear"; however, they apply "only in the 'exceedingly rare' and

23   'extreme' case."  Id. at 73.  "The gross disproportionality principle reserves a constitutional

24   violation for only the extraordinary case." Id. at 77.  The Supreme Court has acknowledged that

25   recidivist statutes are designed to deter repeat offenders and to segregate those who repeatedly

26   commit criminal offenses serious enough to be punished as felonies from the rest of society for an

27   extended period of time.  Rummel v. Estelle, 445 U.S. 263, 284 (1980).  "This segregation and its

28   duration are based not merely on that person's most recent offense but also on the propensities he

19

1   has demonstrated over a period of time during which has been convicted of and sentenced for

2   other crimes.... [T]he point of time during which a recidivist will be deemed to have demonstrated

3   the necessary propensities and the amount of time that the recidivist will be isolated from society

4   are matters largely within the discretion of the punishing jurisdiction." <u>Id.</u> at 285.

5        The Supreme Court has reviewed its decisions involving challenges to grossly excessive

6   sentences based on length of years. <u>Graham v. Florida</u>, 560 U.S. 48, 59-60 (2010). The Court

7   has upheld the constitutionality of a life without parole sentence for possessing a large quantity of

8   cocaine, <u>Harmelin v. Michigan</u>, 501 U.S. 957, 997, 1000–01 (1991), a 25 years to life sentence

9   for theft of golf clubs under the Three Strikes Law, <u>Ewing v. California</u>, 538 U.S. 11 (2003), and

10  two consecutive 25 years to life sentences under the Three Strikes Law following convictions for

11  stealing video tapes, <u>Lockyer</u>, 538 U.S. at 70-77. On the other hand, the Court has held

12  unconstitutional a life without parole sentence for a defendant's seventh nonviolent felony

13  conviction for passing a worthless check. <u>Solem v. Helm</u>, 463 U.S. 277 (1983).

14       Petitioner's sentence is well within Supreme Court precedents. The California Court of

15  Appeal's decision is not contrary to, or an unreasonable application of, clearly established federal

16  law, and is not an unreasonable determination of the facts.

17                              **<u>CONCLUSION</u>**

18       For all the reasons explained above, the state court's denial of petitioner's claims was not

19  objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS

20  RECOMMENDED that the petition for writ of habeas corpus be denied and the case closed.

21       These findings and recommendations are submitted to the United States District Judge

22  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days

23  after being served with these findings and recommendations, any party may file written

24  objections with the court and serve a copy on all parties. Such a document should be captioned

25  "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections,

26  he shall also address whether a certificate of appealability should issue and, if so, why and as to

27  which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

28  applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §

                                        20

1   2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

2   service of the objections.  The parties are advised that failure to file objections within the

3   specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951

4   F.2d 1153 (9th Cir. 1991).

5   Dated:  May 23, 2014

6

7

8   _____
    CAROLYN K. DELANEY
9   UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14   rodr1013.hc

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21